

DA 13-0129

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2014 MT 85

TAYLOR MAYER,

        Petitioner and Appellant,

    v.

BOARD OF PSYCHOLOGISTS,
DEPARTMENT OF LABOR AND
INDUSTRY, STATE OF MONTANA,

        Respondent and Appellee.

| | |
|---|---|
| APPEAL FROM: | District Court of the Thirteenth Judicial District, In and For the County of Yellowstone, Cause No. DV-12-0294 Honorable Susan P. Watters, Presiding Judge |

COUNSEL OF RECORD:

        For Appellant:

            Peter T. Stanley, Attorney at Law, Billings, Montana

        For Appellee:

            Tyler G. Moss, Special Assistant Attorney General, State of Montana Department of Labor and Industry, Helena, Montana

                                Submitted on Briefs: December 3, 2013
                                       Decided: April 1, 2014

Filed:

                    _____
                             Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Taylor Mayer applied with the Montana Board of Psychologists (the Board) for licensure as a psychologist.  When the Board initially denied his application on the ground that he did not meet the education-related qualifications, Mayer exercised his right to a contested case hearing.  Following the hearing, the Hearing Officer entered proposed findings of fact and conclusions of law in favor of Mayer.  The Board thereafter reviewed the Hearing Officer's decision and rejected several of his proposed findings and conclusions.  The Board entered a final agency decision denying Mayer's application.

¶2     Mayer sought judicial review of the Board's final decision in the Thirteenth Judicial District Court, Yellowstone County.  He argued that the Board had misapplied the standards governing the Board's review of a hearing officer's decision.  The District Court affirmed the Board, and Mayer now appeals to this Court.  The issue on appeal is whether the District Court correctly affirmed the Board's final decision.  The question, more specifically, is whether the Board had sufficient grounds for rejecting certain findings and conclusions of the Hearing Officer.  We affirm.

## BACKGROUND

¶3     The Legislature has determined "that the practice of psychology in Montana affects the public health, safety, and welfare and should therefore be subject to regulation and control in the public interest in order to protect the public from the unauthorized and unqualified practice of psychology and from unprofessional conduct by persons licensed to practice psychology."  Section 37-17-101, MCA.  To that end, the Legislature has established the Board of Psychologists, which consists of six members appointed by the

2

Governor with the consent of the Senate. Two members must be licensed psychologists in private practice, one member must be a licensed psychologist in public health, one member must be a licensed psychologist engaged in the teaching of psychology, and two members must be from the general public. Section 2-15-1741, MCA.

¶4 Of significance to this case, the Board is required to license as a psychologist any person who satisfies certain specified criteria. Section 37-17-302, MCA. In particular, the person must be at least 18 years of age and of good moral character, pay the prescribed fee, pass the prescribed examination, and have completed at least two years of supervised experience in the practice of psychology. Section 37-17-302(1), (2), (4), MCA. Additionally, the person must submit evidence that he or she:

> (a) has received a doctoral degree in clinical psychology from an accredited college or university having an appropriate graduate program approved by the American psychological association;
> (b) has received a doctoral degree in psychology from an accredited college or university not approved by the American psychological association and has successfully completed a formal graduate retraining program in clinical psychology approved by the American psychological association; or
> (c) has received a doctoral degree in psychology from an accredited college or university and has completed a course of studies that meets minimum standards specified in rules by the board.

Section 37-17-302(3), MCA. Essentially, under subsections (a) and (b), the person must have completed a graduate program in clinical psychology approved by the American Psychological Association (APA), whereas under subsection (c), the person must have completed a course of studies that meets standards specified by the Board.

¶5 Mayer worked as a counselor at the Yellowstone Boys and Girls Ranch when he decided to pursue a Ph.D. in psychology. He enrolled in the clinical psychology program

at Walden University in 1997 and obtained a doctorate of philosophy in clinical psychology in May 2005. Walden is an online university that administers its classes primarily over the Internet. Since 1990, Walden has been accredited by the Higher Learning Commission, which accredits degree-granting colleges and universities in the north central region of the United States. Walden's clinical psychology program, however, is not accredited by the APA. Thus, Mayer's licensure application fell under subsection (c) of § 37-17-302(3), MCA—meaning that his course of studies had to meet the standards specified in the Board's rules. Those standards are detailed below.

¶6 After obtaining his degree in 2005, Mayer applied with the Board to become licensed as a psychologist. It appears that no decision was made on that application. Mayer renewed his application in late 2008 and provided supporting materials in 2009. As with his initial application, Mayer again relied on the education he had received at Walden. The Board denied the application at a meeting held on June 17, 2010, citing three reasons for the denial: noncompliance with the academic residency requirement, noncompliance with the curricular requirements, and inadequate assessment of student performance in the curriculum.

¶7 Mayer challenged the Board's June 17, 2010 decision and requested a hearing. Under the statutory framework, a person who is denied a license is entitled to a contested case hearing before an impartial hearings examiner. *See* §§ 2-4-631(1), 37-1-121(1), 37-1-131(1)(b), 37-1-307(1)(a), MCA. The hearing must be conducted in accordance with the Montana Administrative Procedure Act, the Montana Rules of Civil Procedure, and the Montana Rules of Evidence, § 37-1-310, MCA, and all parties must be afforded

4

an opportunity to respond and present evidence and argument on all issues involved, § 2-4-612(1), MCA. Although the hearing is conducted by a hearings examiner, the final agency decision is made by the Board. *See* §§ 2-4-621(3), 37-1-131(1)(b), MCA. As will be seen, this puts the Board in the position of first presenting evidence at the hearing and advocating in support of its initial decision denying the licensure application, and then reviewing the hearings examiner's proposed findings and conclusions following the hearing. The Board is not permitted, however, to simply discard the hearings examiner's decision and reaffirm the Board's original denial. Rather, as discussed below, the Board is constrained by the standards of review set forth in § 2-4-621(3), MCA.

¶8 A two-day contested case hearing was held in March 2011. The Hearing Officer admitted seven exhibits, which included documents from Mayer's application file, syllabus pages from Walden University, and guidelines for accrediting professional psychology programs. Two witnesses testified. The Board, through counsel, presented testimony from Dr. Christine Fiore, who is a professor of psychology at the University of Montana. Mayer, who also was represented by counsel, testified on his own behalf. The testimony from both Dr. Fiore and Mayer focused on whether Walden's program met the residency and curricular requirements adopted by the Board for universities that are not APA-accredited. The Board's rules, in summary, contain the following requirements.

¶9 First, as to residency, a non-APA-accredited psychology program must include "a minimum of three academic years of full-time graduate study with a minimum of *one year's residency* at the educational institution granting the doctoral degree." Admin. R. M. 24.189.604(1)(i) (emphasis added). Relevant to the Hearing Officer's analysis, the

5

Board amended the definition of "one year's academic residency" during the time frame when the Board was considering Mayer's application. Under the old definition, "one year's academic residency" meant "18 semester hours or 27 quarter hours earned on a full-time or part-time basis at the educational institution granting the doctoral degree." Admin. R. M. 24.189.301(2) (2009). The residency had to be accumulated in not less than 9 months and not more than 18 months, and had to include "face-to-face (personal)" group courses where there is "both faculty-to-student and student-to-student interaction." Admin. R. M. 24.189.301(2)(a)(i). The institution had to document its assessment and evaluation of the student's performance. Admin. R. M. 24.189.301(2)(c).

¶10 The Board amended Rule 24.189.301(2) in 2010 based on the perception that "some applicants do not appear to understand what is meant by 'one year's academic residency.'" 12 Mont. Admin. Register 1508 (June 24, 2010). The Board sought in the amended rule "to more thoroughly and completely delineate the specific components of the residency requirement." 3 Mont. Admin. Register 303 (Feb. 11, 2010). For example, the rule now defines "one year's academic residency" as "*continuous*, *full time*, active engagement by the student in the elements of the training program while the student is *physically present* during one academic year at the educational institution." Admin. R. M. 24.189.301(2) (2011) (emphases added). The year of academic residency must consist of "two semesters or three quarters with continuous experience on campus, in no less than three month increments," and it must be accrued in no more than 18 months. Admin. R. M. 24.189.301(2)(c). Full-time status means "at least 30 hours on campus per week." Admin. R. M. 24.189.301(2)(d). There must be "face-to-face (personal)"

6

interaction among faculty and students, Admin R. M. 24.189.301(2)(e)(i), and the new definition now makes clear that videoconferencing and other electronic means are not sufficient, Admin. R. M. 24.189.301(2)(b), (g).

¶11 As to curriculum, the Board's rules[1] require that the program "be an organized sequence of study . . . to provide an integrated education experience appropriate to the professional practice of psychology." Admin. R. M. 24.189.604(1)(e). Each student must receive instruction in "scientific and professional ethics and standards, research design and methodology, statistics and psychometrics," and must demonstrate competence in four substantive areas: biological bases of behavior, cognitive-affective bases of behavior, social bases of behavior, and individual differences. Admin. R. M. 24.189.604(1)(i). The program must include at least 60 quarter hours or 40 semester hours of "formal graduate study" in psychology as well as "examination and grading procedures designed to evaluate the degree of mastery of the subject matter by the student." Admin. R. M. 24.189.604(1)(i)(v)(A), (B).

¶12 Dr. Fiore admitted that Mayer's studies at Walden satisfied many, if not most, of the Board's requirements. Nevertheless, it was her opinion that Walden's program did not meet the Board's standards in certain critical respects. She based this opinion on her review of Mayer's application file and the syllabi from the Walden courses Mayer had taken, and on her assessments of Walden's courses against the APA standards and the psychology program at the University of Montana. As noted, Dr. Fiore is a professor of psychology, as well as the Director of Clinical Training, at the University of Montana.

---

[1] The curricular rules were *not* amended during the review of Mayer's application.

The psychology program at the University of Montana is APA-accredited, and Dr. Fiore has twice assisted the University with the accreditation process. She therefore considers herself "very familiar" with the APA standards. Under cross-examination, Dr. Fiore conceded that Mayer's application was not subject to the APA standards or to the policies of the University of Montana; rather, it was subject to the standards adopted by the Board under § 37-17-302(3)(c), MCA. Dr. Fiore opined, however, that the Board's standards and the APA standards are "very similar . . . in terms of hours, residency, courses, etc." In this regard, Dr. Fiore discussed a letter the Board had sent to the APA in 2007 in which the Board indicated that it relies on the criteria developed by the APA's Committee on Accreditation in determining whether a given training program meets the Board's own criteria. Dr. Fiore understood the Board's rules for non-APA-accredited programs, therefore, as being modeled on the APA standards while permitting some "flexibility."

¶13 Based on this understanding, Dr. Fiore opined that Walden's program failed the Board's residency requirement because the Walden program did not require "continuous enrollment for a[n academic] year . . . in physical residence." Dr. Fiore conceded that the Board's old definition of residency does not state expressly that the enrollment must be "continuous" and "in physical residence." She maintained, however, that an academic residency in psychology is not effective unless there is physical presence and continuous enrollment for the academic year. She explained that the residency enables the student to concentrate on coursework, professional training, and scholarship; to work closely with professors, supervisors, and other students; to receive support in thesis, dissertation, or

8

doctoral work through frequent consultations with advisors; and to acquire habits, skills, and insights necessary for attaining a doctoral degree in psychology. Dr. Fiore stated that these purposes are accomplished through continuous close association and mentoring with faculty members and other students. In her opinion, showing up for three-week sessions in the summer and long weekends at other times of year (as Mayer had done) is insufficient for fulfilling an academic residency in psychology.

¶14 As to curriculum, Dr. Fiore went through each of Mayer's Walden courses and explained why she believed the courses were insufficient. She cited primarily two reasons why the courses did not meet the Board's standards. First, as noted, the Board's rules require "an organized sequence of study . . . to provide an integrated education experience appropriate to the professional practice of psychology." Admin. R. M. 24.189.604(1)(e). In Dr. Fiore's opinion, based on her familiarity with APA-accredited graduate programs, Walden's courses were not organized in a proper sequence of study. She stated that she could not perceive "the rhyme or reason of how courses are taken" at Walden. In basing her opinion in part on the APA standards, Dr. Fiore reiterated that the Board's standards are modeled on, and substantially the same as, the APA standards. Second, the Board's rules also require the program to include a certain number of hours of "formal graduate study" in psychology, plus "examination and grading procedures designed to evaluate the degree of mastery of the subject matter by the student." Admin. R. M. 24.189.604(1)(i)(v)(A), (B). In Dr. Fiore's opinion, the classes and level of instruction at Walden were "more consistent with undergraduate level education than graduate level education." Dr. Fiore testified repeatedly that Walden's courses lacked the

necessary "breadth" and "depth" expected of graduate level courses. She also indicated that the methods used at Walden for assessing students' mastery of the subject matter were inadequate. In this regard, Dr. Fiore posited that the one-to-thirty ratio of faculty to students at Walden is "more like undergraduate education" and inhibits appropriate assessment of student competence at a graduate level.

¶15 Mayer testified that he received an undergraduate degree in psychology from the University of Montana in 1991 and a master of science in rehabilitation counseling from Montana State University-Billings in 1995. Mayer has worked in the human services and mental health field since 1992 and at the Yellowstone Boys and Girls Ranch since 1993. He was licensed in Montana as a clinical professional counselor in 1996.

¶16 Mayer explained that he had selected Walden partly because his family lived in Billings and he had been unwilling to relocate to an APA-accredited school. He stated that he had reviewed the Board's rules and concluded that Walden's program met the Board's requirements. Mayer noted that he had contacted the Board early in his studies at Walden and inquired whether Walden was an approved university, but the Board did not give him an answer. Mayer chose to continue his studies at Walden nonetheless.

¶17 Mayer testified that he had completed 27 quarter hours in residence "at Walden" within an 18-month period and that the majority of the residency included face-to-face time with faculty and students. He conceded that the residency consisted of a three-week summer session, several long weekends throughout the year, and then another three-week summer session. As to curriculum, Mayer testified about the topics covered in each of his Walden courses, as stated on the syllabi. He also testified from memory regarding

some of his coursework. He explained having to provide scholarly input at least twice a week to the ongoing list-serve discussions led by the professors, as well as having to provide critical evaluations of other students' work posted on these online forums. Mayer maintained that his studies were "more demanding and interactive" than Dr. Fiore had suggested during her testimony, and he posited that all of his Walden courses were graduate level courses. His opinion in this regard, however, was based on his comparison of his Walden courses to his undergraduate classes at the University of Montana and his master's program at Montana State University-Billings. Mayer conceded that he had no experience with other graduate psychology programs. He also conceded that aspects of the Walden program were not "robust" and that the training depended largely on each individual student's own diligence and "self-motivat[ion]."

¶18 Finally, Mayer noted that he had worked with two Montana-licensed psychologists at the Yellowstone Boys and Girls Ranch. He testified that both psychologists had indicated that they were satisfied with his work in relation to psychological assessment, competency, and consultation services. Mayer stated that, in his opinion, the training he received at Walden met the Board's rules for non-APA-accredited programs and adequately prepared him for the practice of psychology.

¶19 The Hearing Officer issued his proposed findings of fact, proposed conclusions of law, and recommended order on November 14, 2011. As an initial matter, the Hearing Officer addressed the Board's amendments to the definition of "one year's academic residency." As noted, the new definition makes it explicit that the residency must be "full time," consisting of "continuous experience on campus, in no less than three month

11

increments," and that the student must be "physically present" during one academic year at the educational institution. Admin. R. M. 24.189.301(2)(c) (2011). The Hearing Officer construed these as new requirements not imposed by the prior definition of "one year's academic residency." Because the new definition became effective on June 25, 2010—eight days after the Board's initial denial of Mayer's application—the Hearing Officer concluded that the prior definition controls. Though the Board has never disputed that the prior definition is controlling, the Hearing Officer nevertheless concluded that the reasons advanced by the Board and Dr. Fiore for finding Mayer's residency at Walden inadequate were premised on the requirements contained in the amended definition. As such, the Hearing Officer determined that the Board and Dr. Fiore were improperly attempting to subject Mayer to new, inapplicable residency criteria.

¶20     The Hearing Officer also rejected Dr. Fiore's opinion concerning residency for a second reason. Specifically, the Hearing Officer perceived "considerable inconsistencies in her testimony about what standard she was testifying about." The Hearing Officer stated that Dr. Fiore referred "all too frequently" to the APA's criteria and the practices of the University of Montana, and that her testimony displayed "considerable lack of familiarity" with the Board's standards. Based on his interpretation of the prior definition of "one year's academic residency," the Hearing Officer found that Mayer had satisfied the residency requirement because he "attended classes in-person on campus and earned more than 27 quarter hours on a full-time basis," his classes "included student-to-faculty and student-to-student contact and involved personal group courses," and his performance was "documented by the institution."

¶21 As to curriculum, the Hearing Officer found Mayer's testimony alone "sufficient to show that he completed the required course work." Conversely, the Hearing Officer again felt that Dr. Fiore's testimony was "inconsistent about the standards for the course work" because she frequently referred to the curricular requirements of the APA and the University of Montana. The Hearing Officer found that Mayer's studies at Walden included instruction in the various content areas described in Rule 24.189.604, that he successfully completed the required courses, and that he had the requisite meetings with faculty relating to the program and course content. The Hearing Officer dismissed Dr. Fiore's concerns regarding the breadth and depth of Walden's courses, stating merely that "it is clear based on Mayer's testimony and the effect of the rules that he met those requirements." Finally, based on "outstanding recommendations" included in Mayer's application file, which indicated that "Mayer meets the expectations of his peers, and uses and understands the work of a licensed psychologist," the Hearing Officer opined that "any doubts about the sufficiency of his course work should be resolved in his favor because his work experience and the knowledge of those most familiar with it indicate that the knowledge he gained at Walden University was sufficient." The Hearing Officer accordingly recommended that, pending the outcome of his examination, the Board grant Mayer's application for licensure as a psychologist.

¶22 The Board issued its findings of fact, conclusions of law, and final order on February 10, 2012. The Board adopted a majority of the Hearing Officer's findings and conclusions, but rejected or modified several critical findings and conclusions and reinstated its denial of Mayer's application. As to residency, the Board concluded that

13

the Hearing Officer had misinterpreted the definition of "one year's academic residency" under Admin. R. M. 24.189.301(2) (2009). The Board indicated that the residency must be fulfilled at the educational institution and that it must be continuous.[2] The Board modified the Hearing Officer's finding to state: "Mayer attended classes in-person but not on campus." Regarding curriculum, the Board concluded that the Hearing Officer had misapplied the criteria governing the sequence, content, and assessment of Mayer's coursework at Walden. The Board stated that the Walden psychology program "lacked an organized sequence of study" and that the Walden coursework "lacked substantive content, adequate assessment of student competence, and adequate evaluation of student mastery through examinations and grading procedures." In this regard, the Board criticized the Hearing Officer for accepting what the Board characterized as Mayer's "biased, lay testimony" over the "expert" testimony of the Board's witness, Dr. Fiore. Finally, the Board expressed frustration with the Hearing Officer's consideration of the "outstanding recommendations" in Mayer's file. The Board indicated that whether Mayer meets the expectations of his peers is not relevant to the issue of whether Walden's program satisfies the Board's residency and curricular rules.

¶23 Mayer sought judicial review of the Board's decision. In affirming the Board, the District Court concluded that the Board had not erred in accepting Dr. Fiore's testimony over Mayer's testimony concerning the adequacy of Walden's coursework. The District Court acknowledged that Mayer could testify as to the content of his classes; however,

---

[2] Although the Board did not specifically use the word "continuous," the Board did cite two pages of the hearing transcript where Dr. Fiore testified that Walden's residency program is inadequate "[b]ecause there isn't continuous enrollment for a[n academic] year."

the court reasoned that because the only doctoral-level courses he had ever taken were at Walden, Mayer had nothing to compare those courses to and no basis for believing they were adequate under the Board's rules. As to residency, the District Court noted that the record is unclear as to where and how Mayer's residency was completed. Mayer testified that he had completed his residency "at Walden." Conversely, the Board claimed that the residency had occurred at hotel conference rooms. Although the Board did not cite to the record in support of this claim, Mayer did not challenge the assertion either. Thus, the District Court inferred that Mayer's residency did not take place "at the campus" of Walden University. The court concluded that the Board was correct in determining that Mayer had not satisfied the residency requirement. Mayer now appeals.

## STANDARDS OF REVIEW

¶24 The Montana Board of Psychologists is considered an "agency" for purposes of the Montana Administrative Procedure Act. Section 2-4-102(2), MCA. Judicial review of a final agency decision in a contested case is confined to the record. Section 2-4-704(1), MCA. The district court reviews the agency decision to determine whether the agency's findings of fact are clearly erroneous and whether the agency correctly interpreted the law. *Ostergren v. Dept. of Revenue*, 2004 MT 30, ¶ 11, 319 Mont. 405, 85 P.3d 738; *Briese v. Mont. Pub. Employees' Ret. Bd.*, 2012 MT 192, ¶ 11, 366 Mont. 148, 285 P.3d 550. We employ the same standards when reviewing a district court's order affirming or reversing an agency decision. *Ostergren*, ¶ 11; *Briese*, ¶ 11.

¶25 The Board's final agency decision was based in part on the Board's interpretations of its own rules. Those rules were enacted pursuant to the authority of §§ 37-1-131(1)(a),

15

37-17-202(1), and 37-17-302(3)(c), MCA.[3]  The interpretation of an administrative rule is a question of law.  *St. Personnel Div. v. Child Support Investigators*, 2002 MT 46, ¶ 62, 308 Mont. 365, 43 P.3d 305.  However, in determining whether an agency correctly interpreted its own rules, procedures, or policies, the agency's interpretation should be afforded great weight, and the reviewing court should defer to that interpretation unless it is plainly inconsistent with the spirit of the rule.  *Knowles v. State ex rel. Lindeen*, 2009 MT 415, ¶ 22, 353 Mont. 507, 222 P.3d 595.  The agency's interpretation of the rule will be sustained so long as it lies within the range of reasonable interpretation permitted by the wording.  *Knowles*, ¶ 22.

**DISCUSSION**

¶26  ***Did the Board have sufficient grounds for rejecting certain findings and conclusions of the Hearing Officer?***

¶27  Mayer contends that the Board misapplied the standards governing its review of the Hearing Officer's decision.  In reviewing a hearing officer's proposed decision, the Board may reject or modify the conclusions of law and interpretations of administrative rules, but the Board may not reject or modify the findings of fact unless the Board "first determines from a review of the complete record and states with particularity in the order that the findings of fact were not based upon competent substantial evidence or that the proceedings on which the findings were based did not comply with essential requirements of law."  Section 2-4-621(3), MCA.  In reviewing findings of fact, the question is not

---

[3] There has been no challenge in this case to the validity of the Board's residency and curricular rules.  *See Mont. Trout Unlimited v. Mont. Dept. of Nat. Resources & Conserv.*, 2006 MT 72, ¶ 36, 331 Mont. 483, 133 P.3d 224; § 2-4-305(6), MCA.

16

whether there is evidence to support different findings, but whether competent substantial evidence supports the findings actually made. *Knowles*, ¶ 21; § 2-4-621(3), MCA. Competent evidence is evidence that is relevant and admissible. *Black's Law Dictionary* 635, 636, 639 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009). Substantial evidence is "[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla." *Black's Law Dictionary* 640. The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of evidence. Section 2-4-612(7), MCA.

¶28   Mayer argues that it was not the Board's role to weigh inconsistent testimony or to substitute its view of the facts for those found by the Hearing Officer. He maintains that there was competent substantial evidence to support the Hearing Officer's findings and that the Board, therefore, should be reversed. The Board responds that it complied with § 2-4-621(3), MCA. The Board maintains that the Hearing Officer misinterpreted the Board's rules and that his findings were not based upon competent substantial evidence. The Board asserts that the only evidence offered to show that Walden's program satisfied the Board's curricular requirements was Mayer's own "self-interested lay" testimony, which in the Board's view was insufficient to rebut the "expert" testimony of the Board's witness, Dr. Fiore. The Board also argues that the residency requirement was not satisfied because "the location of where the residency hours were earned was simply not established by any evidence."

¶29   Initially, we agree with Mayer that it is not appropriate for a board to substitute its judgment for that of the hearing officer as to the credibility of witnesses and the weight to

be given their testimony. *See St. Personnel Div.*, ¶ 26 ("The purpose of § 2-4-621(3), MCA, is to prevent a reviewing body from substituting its judgment for that of the factfinder."). "A hearing examiner, when one is used, is in the unique position of hearing and observing all testimony entered in the case." *Brackman v. Bd. of Nursing*, 258 Mont. 200, 205, 851 P.2d 1055, 1058 (1993). In *Brackman*, as in the present case, none of the board members had heard the evidence "live"; rather, they were limited to reviewing "a cold record." 258 Mont. at 205, 851 P.2d at 1058. Hence, we stated that "[t]he findings of the hearing examiner, especially as to witness credibility, are therefore entitled to great deference." *Brackman*, 258 Mont. at 205-06, 851 P.2d at 1058 (citing § 2-4-621, MCA).

¶30 Similarly, we do not accept the Board's argument that an applicant must present expert testimony in order to overcome the testimony of the Board's expert witness. A blanket rule of this nature would usurp the hearing examiner's role to judge the credibility of witnesses and the weight to be given their testimony. It also would put applicants in the position of always having to retain an expert in order to challenge the Board's denials of their applications. Of course, without expert testimony, an applicant might fail to demonstrate that his or her application should have been granted. However, that will depend on the particular facts of the case and the applicant's specific circumstances. There is no rule—statutory or administrative—mandating that an applicant present expert testimony at the contested case hearing in order to challenge the denial of his or her licensure application.

¶31 Nevertheless, we conclude the Board's decision was properly affirmed. At the outset, the residency issue is somewhat problematic. To meet the "one year's academic

18

residency" requirement under the prior rule—which all parties agree is controlling—Mayer had to earn 27 quarter hours "at the educational institution granting the doctoral degree." Admin. R. M. 24.189.301(2) (2009). The Board has interpreted "at the educational institution" to mean physical presence, and this is a reasonable interpretation of the rule. *Knowles*, ¶ 22. However, as noted, the record is not clear as to where and how Mayer's residency was completed. Mayer testified that he completed his residency "at Walden," while the Board claimed (without citing to the record) that the residency occurred at unspecified hotel conference rooms. Furthermore, the Board has interpreted the residency rule as requiring "continuous" enrollment, as explained in Dr. Fiore's testimony. Yet, while the amended rule makes this requirement explicit, nothing in the prior rule gave applicants notice that the residency had to be continuous. In fact, the prior rule could be read as indicating just the opposite, by permitting the residency to be earned "on a full-time or part-time basis" over a period of "not less than nine months and not more than 18 months." Admin. R. M. 24.189.301(2)(a) (2009).

¶32 We need not resolve the parties' arguments regarding the residency requirement, however, because we conclude the Board's denial of Mayer's application is supported by the curricular requirement. First, the Hearing Officer erred in rejecting Dr. Fiore's assessment of Mayer's studies at Walden on the ground that she relied "too frequently" on the APA standards and the practices at the University of Montana (whose psychology program is APA-accredited). The Hearing Officer perceived the Board's curricular standards as being materially different from the APA standards. That was an incorrect interpretation of the Board's rules. Based on her familiarity with the Board's standards

19

and the history of their adoption, Dr. Fiore testified that the Board modeled its curricular standards on the criteria developed by the APA's Committee on Accreditation. Thus, the reason Dr. Fiore did not attempt to distinguish between the Board's rules and the APA rules is that the two are, as she put it, "very similar." The Board, through this witness's testimony, has construed its curricular standards as mirroring the APA criteria. In light of Dr. Fiore's unrefuted testimony, this interpretation is reasonable and the Hearing Officer should have deferred to it. *Knowles*, ¶ 22.

¶33    Second, the Board's rules require "an organized sequence of study . . . to provide an integrated education experience appropriate to the professional practice of psychology," and the program must involve "formal graduate study" in psychology. Admin. R. M. 24.189.604(1)(e), (i)(v)(A). Based on her familiarity with APA-accredited graduate programs, Dr. Fiore testified that Walden's courses were not organized in a proper sequence of study and did not have the necessary breadth and depth expected of graduate level courses. Although Mayer opined that his Walden courses were graduate level courses, he admittedly had no knowledge of other graduate psychology programs. Other than comparing his Walden classes to his undergraduate classes at the University of Montana and his master's program at Montana State University-Billings, he had no frame of reference or basis for giving an opinion as to whether Walden's courses were organized in a proper sequence or whether they constituted "formal graduate study" under the Board's rule. The Hearing Officer's finding that Walden's courses satisfied the Board's curricular rules was, therefore, not based upon competent substantial evidence.

## CONCLUSION

¶34 The Board was permitted to reject or modify the Hearing Officer's interpretations of the Board's rules and to reject or modify any finding of fact that was not based upon competent substantial evidence. The Hearing Officer's finding that Walden's program satisfied the Board's curricular criteria was based on a misinterpretation of the Board's rules and was not supported by competent substantial evidence. Accordingly, the Board did not misapply the standards of review in reinstating its denial of Mayer's application, and the District Court did not err in affirming the Board's final agency decision.

¶35 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BETH BAKER